## Allentown School District Referendum

*William G. Malkames,* for petitioner.

*John M. Ashcraft, III, Assistant County Solicitor,* and *John E. Roberts, County Solicitor,* for respondent.

*Leighton Cohen,* for Organization of Concerned Parents.

DAVISON, *J.,* March 26, 1980—The Election Board of Lehigh County (Election Board) seeks to place the following nonbinding question on the ballot for the 1980 primary election scheduled to be held on April 22, 1980:

Should the Allentown School District continue implementation of the Long Range Plan it adopted July 28, 1977, which provides for grade level reorganization and the closing, razing, renovating and constructing of school buildings for a net reduction in the number of buildings maintained?

The question is preceded by the following notice:

NOTICE: Your vote on the question below is advisory, and is not binding on any governmental body or official.

We have before us the petition of the School District of the City of Allentown (ASD) opposing the placement of the question on the ballot. The Or-

ganization of Concerned Parents (OCP), at whose instance the matter came before the Election Board, is a recently organized group opposing the introduction of the middle school concept into the Allentown School District and favoring the ballot referendum.

The only issue before this court is whether the Election Board[1] may properly place this particular question on the primary ballot. Our decision is in no way intended to reflect the court's view with respect to ASD's long range plan.

Preliminarily, it is significant to observe that the Election Board has completely changed the question which OCP and the many signers of petitions requested be placed on the ballot, namely, "Should the proposed Middle School concept be implemented by the Allentown School District?"

The record reflects that on July 28, 1977, the Allentown School Board, concerned about the decline in student enrollment (23 percent between 1970 and 1980) and the possible obsolescence of several school buildings, adopted what the parties refer to as a "long range plan." The long range plan was adopted only after some 90 meetings and discussions with various groups dating back to January of 1976, including the Mayor of the City of Allentown, members of the Allentown City Council, various PTA's, local service clubs, the Pennsylvania Department of Education, Allentown Education Association and various parents, teachers, administrators and the public generally. The plan contemplated, inter alia, the flow of more tax dollars into the educational program and relatively

---

1. The Election Board consists of County Executive David K. Bausch, Joyce Millam and Grace Moritz.

less into the maintenance of buildings and, specifically called for the creation of new schools, the introduction to the district of the middle school concept and the elimination of some existing schools. In the intervening two and one-half years, a number of steps have been taken to implement the plan including, but not limited to, the closing and selling of the Garfield and Herbst elementary schools, renovating at a cost of approximately $680,000 the Raub Junior High School and the expenditure of approximately $400,000 for architectural and design services in connection with renovations at various existing schools. OCP, apparently the only organized opposition to the middle school concept, materialized only within recent months.

Article 3, §14, of the Pennsylvania Constitution provides: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pursuant thereto, the legislature enacted the Public School Code of 1949[2] which reposes in school board directors the authority to operate the schools and in the Pennsylvania Department of Education the responsibility to oversee the operation thereof. The Public School Code authorizes school boards to "establish, equip, furnish and maintain" schools and "to provide the necessary grounds and suitable school buildings to accommodate all the children." 24 P.S. §§5.501, 502 and 7.701.

The Election Board and OCP urge that the proposed ballot question by analogy to Trexler Lake Project Referendum, 4 D. & C. 3d 99, 37 Lehigh

2. Act of March 10, 1949, P.L. 30, 24 P.S. §1-101 et seq.

378 (1977), will afford the electorate an opportunity to express an opinion on the issue; they rely heavily on our Trexler Lake decision. While there is legislative silence on the subject of nonbinding advisory questions and, in certain limited cases, as in Trexler Lake, the courts have sanctioned nonbinding referenda on issues of *major significant local impact,* it goes without saying that questions may not be put before the electorate without limitation,[3] particularly where the legislature has squarely and specifically placed in the hands of school board members the matter of the operation of school districts. As Judge Backenstoe providently observed in his concurring opinion in Trexler Lake: "It is not the intention of the court, nor would it be in the public interest, to open a floodgate of advisory questions on every issue of public moment." Moreover, the Trexler Lake referendum involved a project not of a local body but rather of the Federal government and the U.S. Army Corps of Engineers over which Lehigh County voters had no ballot control other than through the election of a single congressman and two senators.

The result we reach is consistent with School Building Referendum, Shanksville Stoneycreek School District, 27 Somerset 10 (1971), relied upon by ASD, where the court declined to sanction the placement on the ballot of a nonbinding question seeking the support of the electorate for a proposed building construction program and held that the Public School Code specifically vests in the school

---

3. At oral argument, counsel for OCP answered in the affirmative that the following questions would be proper ballot referenda: the appointment of a new football coach or of the head of the English department and school field trips.

directors authority over the construction of school buildings without providing for referendum.

There are additional reasons why we are constrained to enjoin the proposed ballot question. The inartful, prolix and complex nature of the question itself raises several problems with respect to the propriety of placing it on the ballot. What does the question mean? Reference is made to the July 28, 1977 long range plan. Informed voters, the kind of voters the Election Board and OCP hope to attract, may well be desirous of reviewing the plan's provisions. Will copies of the plan be made available and, if so, where, or will copies be provided at the polls?[4] What does "grade level reorganization" mean? Is "grade level reorganization" intended to be synonymous with the middle school concept and, if so, does not the addition of "the closing, razing, renovating and constructing of school buildings for a net reduction in the number of buildings maintained" go much further. While we by no means demean the efforts of the framers thereof and we are not unmindful of the time and effort presumably expended in developing the question, we have serious reservations as to precisely what it means.

Moreover, although much of the concern about the plan seemingly relates to the middle school concept,[5] and it is for that reason the referendum was suggested, the question has been so convoluted that the electorate would no longer be polled on the

4. At oral argument, counsel for the Election Board answered this inquiry in the negative, stating that the voters have a duty to educate themselves.

5. The record includes a letter dated December 31, 1979, wherein then counsel for OCP wrote to the Chairman of the Election Board that OCP "is a group of parents and taxpayers who are opposed to the proposed middle school program."

middle school concept. The final objection to the wording of the proposed question is that while the question is obviously complex, it assumes a simplistic answer, viz., "yes" or "no." In fact, the problem is too complex to admit of such an answer, and the question presents no alternatives.

To those who suggest that this constitutes disenfranchisement of the electorate, we point out that from its inception, the people of this nation have exercised a traditional remedy—at the polls. To counsel for OCP who suggested at oral argument that the deletion of the question from the ballot would signify a lack of confidence in the ability of the voters to decide the issue, we point out that the long and sound track record of the local citizenry is such that if they determine the board's actions, including the long range plan, to be unresponsive, inimical or contrary to the public good, the voters will express disapproval at election time. Indeed, we perceive that the flurry of recent activity and the many sincere concerns expressed at public gatherings, such as those before the Election Board on January 22, 1980, have caused the school board to pause in moving further toward implementation of the long range plan.

As the late Judge Kramer of the Commonwealth Court observed in Williams v. Rowe, 3 Pa. Commonwealth Ct. 537, 544-45, 283 A. 2d 881 (1971), cited by Judge Wieand in Roth v. Saeger, 36 Lehigh 515 (1976):

"It is indeed fitting that the electorate be given the opportunity to initiate some types of legislation and similarly to call into question the implementation of certain types of proposed legislation. However, the General Assembly has not extended that right to every possible area of legislation. One of the

prices paid for the creation of a representative democracy is the vesting by the electorate of trust and responsibility in its elected representatives. Discretion is placed within the hands of the municipal legislators and we must accept the lawful exercise of this discretion. The efficiency of government, its stability and the protection of the public at large necessitates the creation of certain categories wherein the legislative prerogative is unfettered by the initiative and referendum processes. The electorate nevertheless is not helpless in defending itself against unlawful legislation in the statutorily excluded areas, for it is before our courts that one may come and assert the illegality of a particular piece of legislation. Furthermore, it is at the ballot box that a voter may express his disapproval of the legislative programs of his elected officials." See also Borough of Lansdale v. Election Board of Montgomery County, 7 D. & C. 3d 220 (1978).

We hold, therefore, that where no specific legislative authorization exists and except for issues of major significant local impact involving an absence of direct ballot control and circumstances attendant thereto, such as in Trexler Lake, the court is powerless to sanction ballot status for nonbinding referenda questions.

### ORDER

Now, March 26, 1980, following oral argument and consideration of the briefs and the record, and for the reasons set forth in the accompanying opinion, it is ordered that the Election Board of Lehigh County is enjoined from placing on the ballot the question referred to in the within opinion.